The appellant, Victoria Eugenia McElroy, was indicted for the offense of possession of a controlled substance, diazepam, in violation of § 20-2-70, Code of Alabama 1975. After McElroy waived a trial by jury and requested that the question of her guilt or innocence be determined from the evidence taken during the prior suppression hearing, the trial court found her guilty as charged and sentenced her to imprisonment for a term of two years and fined her two hundred dollars.
This appeal presents the sole question of whether the trial court erred in overruling McElroy's motion to suppress evidence of two diazepam tablets seized from McElroy without a warrant.
The following rendition of events leading up to McElroy's arrest was presented at the suppression hearing.
Between 1:00 and 1:30 a.m. on June 13, 1983, Officers Hocutt and Latner of the Tuscaloosa Police Department observed a vehicle stop in the middle of an intersection and block several lanes of traffic. When the light changed and the vehicle still did not move out of the intersection, the officers suspected that the driver might be having some sort of trouble. They approached the vehicle and asked the driver, Russell Caldwell, for identification and his driver's license. Caldwell got out of his car and, from the officers' observations, Caldwell was arrested for driving under the influence. He was also given a ticket for an improper turn.
After arresting Caldwell, Officer Latner observed a bulge in Caldwell's pants pocket when he frisked him. (The officer had no definite recollection as to the order in which he handcuffed and frisked Caldwell.) In determining if the bulge was a weapon, the officer pulled from Caldwell's pocket a knife, a pen, a comb, a lighter, some keys, and a small white pill with the identifying mark "Lemmon 714" on it. He suspected this white pill to be a controlled substance; this belief was based upon his prior arrests of persons possessing the same type of pill which was later determined to be a controlled substance.
As a result of Caldwell's arrest, Caldwell's vehicle was taken into police custody. Caldwell's companion, McElroy, who was sitting in the front passenger's seat, was given the option of walking or going to the police headquarters, where she could call someone to take her home. She decided to go with the officers, so she remained in Caldwell's car.
While driving Caldwell's car to police headquarters, Officer Latner noticed that McElroy was "frantically hunting something" in her purse. At the officer's inquiry, *Page 1339 
McElroy stated that she was looking for her identification. Although the officer explained that she needed no identification because she was not under arrest, Ms. McElroy continued fumbling in her purse until she retrieved two small pills. Officer Latner saw the pills and observed that they looked like the pill taken from Caldwell; although he could not see the mark "Lemmon 714", he noted that they too were small, round, white pills. McElroy attempted to throw the two pills out the window, but her attempt was futile because the window was raised; her hand simply hit the window. Officer Latner then seized the pills from her hand and ordered her to keep her hands still.
Officer Latner testified that when he and McElroy arrived at the station, he observed that McElroy was having trouble standing, that "she was just out of it," and that "she looked like she was on something." A closer examination of the confiscated pills revealed the marking "Lemmon 714". McElroy was informed of her Miranda rights and searched. This search produced nothing. When McElroy was taken to the booking desk, where she saw her companion Caldwell, Caldwell asked if the officers had found anything on her. She replied, "Yes, but you know they were yours. I told you you were too messed up to drive." At a later time, she disclosed to Officer Latner that she and Caldwell had been at a party where they were drinking or "popping pills."
The parties stipulated that an analysis of the two seized pills disclosed the controlled substance diazepam.
McElroy contends that the seizure of the pills was unconstitutional under the Fourth Amendment's proscription against unreasonable searches and seizures.[1] We disagree and hold that the trial court properly denied McElroy's motion to suppress evidence of the controlled substance. Our determination of the legality of this seizure is governed by the guidelines espoused by the United States Supreme Court inCoolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022,29 L.Ed.2d 564 (1971). There, a plurality of the Court decreed that the "plain view" doctrine provides ground[2] for the warrantless seizure by police officers of private possessions if the following three requirements are satisfied:
 "First, the police officer must lawfully make an `initial intrusion' or otherwise properly be in a position from which he can view a particular area. Id., at 465-468 [91 S.Ct. at 2037-39]. Second, the officer must discover incriminating evidence `inadvertently,' which is to say, he may not `know in advance the location of [certain] evidence and intend to seize it,' relying on the plain-view doctrine only as a pretext. Id. at 470 [91 S.Ct. at 2040]. Finally, it must be `immediately apparent' to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure. Id., at 466, 91 S.Ct. at 2038."
Texas v. Brown, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540,75 L.Ed.2d 502 (1983). *Page 1340 
It is clear in this case that the presence of the first and second criteria of Coolidge are not in issue. First, Officer Latner certainly was in a location where he had a right to be by virtue of § 32-5A-139 (c)(3), which reads as follows:
 "(c) Any police officer is hereby authorized to remove or cause to be removed to the nearest garage or other place of safety any vehicle found upon a highway when:
. . . . .
 (3) When the person driving or in control of such vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before a proper magistrate without unnecessary delay. . . ."
Section 32-1-4 (b) provides that "any person charged with driving while under the influence of intoxicating liquor or of narcotic or other drugs" shall be taken by the arresting officer "forthwith before the nearest or most accessible magistrate". Therefore, the initial intrusion which afforded the observation was lawfully justified.
Likewise, the second Coolidge requirement was fulfilled. The evidence offers no indication that stopping McElroy's companion, arresting him for driving under the influence, and seizing his automobile constituted a planned scenario whereby contraband might be uncovered.
At issue is the third requirement of whether the incriminatory nature of the pills was "immediately apparent"; McElroy contends that Officer Latner could not identify the tablets as contraband at the time he seized them. In Texas v.Brown, 460 U.S. 730, 103 S.Ct. 1535, a plurality of the United States Supreme Court rejected the lower court's ruling that the "immediately apparent" requirement means that the officer must be possessed of near certainty as to the incriminatory nature of the items, that he must "know" that certain items are contraband or evidence. Moreover, the Court declared theCoolidge phrase "immediately apparent" an "unhappy choice of words," for it "can be taken to imply that an unduly high degree of certainty as to the incriminatory character of the evidence is necessary for an application of the `plain view' doctrine." Id. 403 U.S. at 741, 103 S.Ct. at 1542. In clarification, it adopted the rule expounded in Payton v. NewYork, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639
(1980): "The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assumingthat there is probable cause to associate the property withcriminal activity." 460 U.S. at 741-42, 103 S.Ct. at 1542
(emphasis added in Texas v. Brown).
In defining "probable cause", the Court stated:
 "As the Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would `warrant a man of reasonable caution in the belief,' Carroll v. United States, 267 U.S. 132, 162
[45 S.Ct. 280, 289, 69 L.Ed. 543] (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A `practical, nontechnical' probability that incriminating evidence is involved is all that is required. Brinegar v. United States, 338 U.S. 160, 176 [69 S.Ct. 1302, 1311, 93 L.Ed. 1879] (1949). Moreover, our observation in United States v. Cortez, 449 U.S. 411, 418 [101 S.Ct. 690, 695, 66 L.Ed.2d 621] (1981), regarding `particularized suspicion,' is equally applicable to the probable-cause requirement:
 `The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same — and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by *Page 1341 
those versed in the field of law enforcement.'"
460 U.S. at 742, 103 S.Ct. at 1543.
Although we recognize and follow the reasoning of Texas v.Brown, we do not believe it has generated or will generate any major change in our law. The Alabama courts have long recognized that "[f]or an item in plain view to be validly seized, the officer must possess some judgment at the time that the object to be seized is contraband and that judgment must be grounded upon probable cause." Shipman v. State, 291 Ala. 484,282 So.2d 700, 704 (1973). "[I]t is not necessary that the seizing officer be convinced beyond a reasonable doubt as to the incriminating nature of the evidence discovered. The evidence needs only to raise the probability that criminal activity is afoot." Smith v. State, 472 So.2d 677
(Ala.Crim.App. 1984), citing Herrin v. State, 349 So.2d 103
(Ala.Crim.App.), cert. denied, 349 So.2d 110 (Ala. 1977).
In applying these considerations and those of Texas v. Brown
to the instant case, the crucial question is whether the officer had before him facts and circumstances which would "warrant a man of reasonable caution in the belief" that the pills may be contraband. We find that he did; Officer Latner's awareness of the incriminatory nature of the pills, as reflected by his testimony that he "was convinced they [the pills] were a controlled substance," was based upon probable cause supported by the totality of the circumstances rather than upon mere suspicion, as argued by McElroy.
In addition to the general experience gained in his eight years as a police officer, Officer Latner had received specialized training in identification of controlled substances in a course at the Alabama Law Enforcement Academy and, also, on-the-job training during a two-week, special detail with the narcotics division. Although drug arrests comprised a minority of the total arrests made by the patrol officer, these arrests had provided him with a particularized knowledge of the pills seized in the instant case. In fact, he had previously testified in twenty-five to one hundred trials involving defendants charged with possession of pills like those seized from McElroy. Moreover, the officer's conclusion as to the nature of the pills was buttressed by his observation and close examination of an identical tablet seized from McElroy's companion shortly prior to his plain view of the tablets in McElroy's possession. "A law enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person." Texas v.Brown, 460 U.S. at 746, 103 S.Ct. at 1545 (Powell, J., concurring) citing United States v. Cortez, 449 U.S. 411, 418,101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).
In addition, McElroy's gesture in trying to dispose of the pills was an additional indication of the pills' illicit nature. While McElroy's attempt, standing alone, would not rise to the level of probable cause to justify a search, it served to support Officer Latner's judgment that McElroy was in possession of contraband. Thus, when confronted with his observation that the pills in McElroy's possession appeared to be Quaaludes and, with, McElroy's gesture, which could reasonably be interpreted as an attempt to remove the pills from the officer's view and from her possession, Officer Latner had reasonable grounds to seize the pills; this evidence certainly "raise[d] the probability that criminal activity was afoot."
To the contrary, McElroy contends that the following testimony of Officer Latner on cross-examination illustrates her proposition that, at best, Latner possessed a mere suspicion of the pills' incriminatory nature:
 "Q. Wouldn't it be fair to say, Officer, at that point when you saw her with that stuff in her hand, at best you had a suspicion that it might be contraband?
"A. That is what I figured it was, sir.
"Q. You had a suspicion, didn't you?
 "A. Yes, sir, when she was trying to throw it out the window. *Page 1342 
 "Q. Her actions told you and, therefore, at best you had a suspicion that she might have contraband?
"A. Yes, sir.
". . . .
 "Q. . . . you thought based on her actions that she might have contraband, but the fact is you could not clearly identify them as being contraband, could you?
"A. No, sir, I could not.
". . . .
"A. I thought she had two pills of some sort.
 "Q. But it could have been something else. You didn't know for sure.
"A. Yes, sir, it could have been Maalox or anything."
Considering this testimony in the context of Officer Latner's entire testimony, we find that McElroy's contention is without merit.
We are also not persuaded otherwise by the cases relied on by McElroy in support of her argument, Shipman v. State, supra, and Gaines v. State, 429 So.2d 630 (Ala.Crim.App. 1982). In examining these cases, we find that the statement "two cases are seldom sufficiently alike for the first to be an absolute binding precedent for the second" is appropriate. Vogel v.State, 426 So.2d 863, 876 (Ala.Crim.App. 1980), aff'd,426 So.2d 882 (Ala. 1982), cert. denied, 462 U.S. 1107,103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), quoting Arrington v. UnitedStates, 311 A.2d 838 (D.C.App. 1973). In Shipman v. State, the Alabama Supreme Court held that the seizure of cellophane packages containing a white substance (later determined to be heroin) in plain view was invalid because the officer seizing the packages had no judgment that the substance was contraband.291 Ala. at 488, 282 So.2d at 704. The arresting officer had testified that he did not know what was in the package, and he was not qualified as an expert in detecting heroin, 51 Ala. App. 80
at 83, 84, 282 So.2d 696 at 699. In Gaines v. State, the court determined that the officer's seizure of a small, round bottle (later determined to contain diazepam), which the appellant had taken from his pocket, was not justified under the "plain view" doctrine. The officer testified at the suppression hearing that he did not know what was in the bottle. The court determined that the record contained no evidence to indicate that the officer was aware of the incriminatory nature of the tablets prior to seizing the bottle. The holdings in these two cases do not dictate our disposition of the instant case, simply because the facts of each of the two cases are distinguishable from those now before us. In the instant case, Officer Latner possessed facts which, by his past experience and training, were sufficient to warrant a valid, practical, common-sense judgment that the pills in his view were contraband.
In conclusion, we find that, in light of the totality of the circumstances and the demonstrated experience and perception of the officer, probable cause existed to associate the pills with criminal activity. Once the probable cause requirement of the "plain view" doctrine was met, it was constitutionally permissible for Officer Latner to seize the controlled[3]
substance. Accordingly, the trial court properly allowed such evidence to support McElroy's prosecution and subsequent conviction. Therefore, the case is due to be, and is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] Our sole concern under these facts is the seizure of pills, for "an officer's mere observation of an item left in plain view . . . generally involves no Fourth Amendment search. . . ." Texas v. Brown, 460 U.S. 730, 738, n. 4, 103 S.Ct. 1535,1540, n. 4, 75 L.Ed.2d 502 (1983).
[2] Although the "plain view" doctrine has been labeled an independent exception to the Fourth Amendment warrant requirement, e.g., Washington v. Chrisman, 455 U.S. 1, 5-6,102 S.Ct. 812, 815-17, 70 L.Ed.2d 778 (1981); Coolidge v. NewHampshire, 403 U.S. at 443, 91 S.Ct. at 2022; Daniels v. State,290 Ala. 316, 276 So.2d 441 (1973), the United States Supreme Court has recently declared that, "[a]t least from an analytical perspective, this description may be somewhat inaccurate." Texas v. Brown, 460 U.S. at 738,103 S.Ct. at 1540. In attempting to put the doctrine in its Fourth Amendment context, Justice Rehnquist stressed the following:
 "`[P]lain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment. `Plain view' is perhaps better understood, therefore, not as an independent `exception' to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's `access to an object' may be."
Id. at 738-39, 103 S.Ct. at 1540-41 (footnote omitted).
[3] Thus, we need not determine whether Officer Latner's seizure could also be justified by the presence of exigent circumstances, as McElroy could have destroyed or disposed of the two pills. *Page 1343